# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILLY R. CUSTER, | ) 1:06cv1117 LJO DLB |
| | ) |
| | ) |
| | ) FINDINGS AND RECOMMENDATION |
| Plaintiff, | ) REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **BACKGROUND**

Plaintiff Billy R. Custer ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for findings and recommendation to the District Court.[1]

---

[1] Due to the recent appointment of Judge Lawrence J. O'Neill to the position of United States District Judge, this case was reassigned to the Honorable Dennis L. Beck on October 2, 2007.

1

**FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff filed his application on April 20, 2004, alleging disability since March 31, 2003, due to injuries to his right shoulder and right knee. AR 60-64. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 39-43, 46-50, 51. On January 12, 2006, ALJ Christopher Larsen held a hearing. AR 300-332. ALJ Larsen denied benefits on March 21, 2006. AR 11-20. On June 29, 2006, the Appeals Council denied review. AR 5-8.

Hearing Testimony

ALJ Larsen held a hearing on January 12, 2006, in Fresno, California. Plaintiff appeared with his attorney, Robert Ishikawa. Vocational expert ("VE") Thomas Dachelet also appeared and testified. AR 300.

Plaintiff testified that he was 54 years old at the time of the hearing and received a high school diploma. He worked as a route salesman for a bakery for 30 years. AR 305.

He had three industrial injuries. The second injury was to his right shoulder in February 2001. AR 306-307. He had surgery in May 2001 and went back to work with restrictions. AR 307. Plaintiff explained that he has difficulty reaching overhead with his right arm and that reaching overhead is uncomfortable and causes his shoulder to pop. He could not frequently reach on a daily basis. AR 308. When asked if he could do it occasionally, Plaintiff explained that he had good days and bad days, so it varies. He had ongoing pain in his right shoulder that he has learned to live with. AR 308.

Plaintiff had an injury to his right knee in December 2002. He tore his ACL and medial meniscus and had reconstructive surgery in April 2003. He has a lot of pain in his knee and along the sides. AR 309. Plaintiff has used a brace since the surgery and is getting a new one since he wore the last one out. AR 310. He has problems being on his feet and explained that the time he could do so varied. Some days it would be three to four hours, other times it would be one hour. His knee "swells up continuously" and he has problems going down and climbing

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

stairs. He also has problems walking on uneven ground. AR 310-311. He thought he could walk a couple of blocks, some days farther and some days less. AR 311. If he has three to four good days a month, he's doing well. AR 311.

When he's home, he sits in a recliner and elevates his legs for four to six hours off and on, to reduce the swelling and pain. He also elevates his leg when he sleeps. AR 311-312. If he sits for too long, he gets sciatica "real bad." AR 312. He thought he could sit for three to four hours maybe two to three days a week. AR 312.

Plaintiff further testified that he had surgery for a ganglion cyst in his right wrist in February 2005. The cyst recurs and he needs to get the fluid drained so that he can use his hand. AR 313. It affects his hand between ten and thirty days a month. AR 314. He cannot hold a pen when it's at its worst. AR 315.

Plaintiff also has constant pain in his neck that gives him minor headaches and causes his left arm to tingle. AR 315. He does not have much strength in his left arm since his arthritis and finds it uncomfortable to do many activities with his left arm. Plaintiff thought he could lift 100 pounds from the ground to his waist, but nothing above his waist. AR 316.

During the day, Plaintiff testified that he doesn't do much. He golfs "a couple of times" a week and does minor chores around the house, such as vacuuming once in a while. Some mornings he gets up and can't do anything. Other days, he can go shopping and take his dog for a walk. He adjusts his daily activities based on his pain level. When he golfs, he cannot make a full golf swing. He explained that Dr. McCann had him swing a golf club in therapy and then gave permission for Plaintiff to play as long as he didn't take full swings and wore his brace. AR 317. Plaintiff drives, but his wife does most of the shopping. He barbeques once in a while, but his wife does most of the cooking, laundry and housecleaning. AR 318. Plaintiff can do "a little bit" of archery and does a "little bit" of hunting in August and September, although he doesn't shoot his bow on a consistent basis. AR 318.

Plaintiff takes a medication for his arthritis that keeps him awake at night. He also takes Vicodin, which upsets his stomach. AR 319. He had sciatica about 10 to 12 times in the past

year, and each time lasts about 10 to 15 days, sometimes as many as 30 days. AR 320. He believes the sciatica is caused by favoring his right leg. AR 321.

Plaintiff explained that a normal round of golf is four hours, but he tries to play small courses like Airways, which is three to three and a half hours. Although he tries to play twice a week, he usually doesn't make it twice a week. Walking some, but not too much, helps his sciatica. AR 322. He uses a cart sometimes, but when his sciatica is bad, he walks. AR 322.

The VE testified that Plaintiff's past work as a bakery truck driver was heavy work and that Plaintiff gained transferrable skills that would apply to sales positions. AR 324.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience, who could not work at or above shoulder level. This person cannot push or pull more than 20 pounds with his right arm at any time. The VE testified that this person could not perform Plaintiff's past relevant work, but could perform sedentary and light unskilled positions. AR 324.

For the second hypothetical, the ALJ asked the VE to assume that this person could lift and carry 20 pounds occasionally, 10 pounds frequently, sit a total of six hours and stand a total of six hours. This person could occasionally climb, kneel, crouch, and crawl and frequently balance and stoop. This person cannot reach at or above shoulder level with his right arm and his ability to push or pull with the right arm is limited. AR 325. This person could not perform Plaintiff's past relevant work, but could perform semi-skilled light positions in retail sales and as a cashier. AR 325-326. The entire world of sedentary and light work, unskilled, were also available. AR 327.

For the third hypothetical, the ALJ asked the VE to assume that this person could not lift or carry more than 10 pounds above waist level, could stand and walk no more than four hours total, and can sit for two to three hours, two to three times a week. This person can climb ramps or stairs occasionally and can never climb ladders, ropes or scaffolds. This person can perform no lifting above chest level and is unable to perform fingering or feeling with the right hand at least 10 days out of the month, and sometimes 30 days out of the month. The VE testified that this person could not perform work. AR 327-328.

Plaintiff's attorney asked the VE to assume the limitations set forth in Dr. Martinson's November 2004, report. This person is precluded from forceful strength activities with his right arm and heavy lifting. This person could not perform prolonged weight bearing, climbing, squatting, kneeling, crouching, crawling and other activities involving comparable physical effort with his right lower extremity. This person could not perform his past relevant work and would be limited to sedentary work. There would be no transferrable skills to the sedentary classification. AR 328.

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles. AR 329.

Medical Evidence

In February 2001, Plaintiff injured his right shoulder while at work. He had surgery in May 2001, followed by physical therapy. AR 107-113, 174.

In June 2001, Plaintiff was discharged from physical therapy for his right shoulder. The discharge note indicates that Plaintiff was "doing excellent at 7 weeks post-op." Range of motion was very good and strength was continuing to improve. Plaintiff felt he was able to return to work on a light basis. AR 107.

In December 2002, Plaintiff injured his right knee while working. AR 191-192.

An MRI of Plaintiff's right knee on January 24, 2003, revealed partial tears of the anterior and posterior cruciate ligaments and a small radial tear of the anterior portion of the posterior horn of the medial meniscus. AR 191.

On January 27, 2003, Plaintiff saw Peter D. McGann, M.D. in follow-up for his right shoulder. Plaintiff was still working in his usual and customary capacity but had to modify his work activities because he could not carry as many racks as he could previously. He could not push or pull with the same force, either. Plaintiff reported that he had given up bowling, found it difficult to play volleyball, but still did archery occasionally. Swinging a golf club occasionally caused popping. On examination, his sternoclavicular joint was still slightly lax and moved a couple of millimeters. There was also a slight amount of swelling in the joint, but it was not

1  painful to palpation. Dr. McGann opined that Plaintiff was permanent and stationary because
2  there was little that could be done for the joint on a surgical basis. AR 235-236.
3       On March 10, 2003, Dr. McGann recommended that Plaintiff undergo right knee
4  arthroscopy, a meniscus excision and ACL reconstruction. AR 231. He thought Plaintiff would
5  be able to resume his usual and customary occupation about four or five months after surgery.
6  AR 231.
7       On April 1, 2003, Plaintiff underwent arthroscopic and reconstructive surgery on his
8  right knee. AR 227-229.
9       Plaintiff saw Dr. McGann on April 3, 2003. He was instructed to start physical therapy
10 and remain on temporary total disability until April 21, 2003. AR 226.
11      On April 21, 2003, Plaintiff reported that he washed his truck the day before and thought
12 he overdid it. He had swelling below the knee. Dr. McGann wanted to rule out deep vein
13 thrombosis. AR 223-224.
14      Plaintiff underwent physical therapy from April 2003 through August 2003. AR 114-186.
15      On May 23, 2003, Plaintiff reported some swelling and popping, but explained that he
16 mowed the lawn without his brace. On examination, his leg was swollen all the way to the ankle
17 and Dr. McGann indicated that Plaintiff was stable but had persistent right knee effusion. He
18 was released to work in a semi-sedentary capacity where he could walk half-time and be seated
19 half-time. He could not squat, crouch, kneel, stoop, walk on uneven terrain, climb, or perform
20 prolonged standing. He needed to wear his brace while working. He was too swollen to be fitted
21 with a permanent brace. AR 221-222.
22      Plaintiff saw Dr. McGann on June 24, 2003. He was still having some popping and mild
23 swelling. His strength was improving. Plaintiff was released to a semi-sedentary capacity,
24 though Dr. McGann indicated that this was not available. AR 219-220.
25      On August 8, 2003, Plaintiff's knee was stable with no effusion. He was released to
26 modified work with restrictions against squatting, crouching, kneeling, stooping or climbing. He
27 needed to wear his brace at work. AR 217.
28

On October 2, 2003, Plaintiff returned to Dr. McGann and reported that in August, he was doing a leg press in physical therapy and felt as if something popped and shifted in his knee. He has had ongoing discomfort since. He had considerable pain in his knee and mild effusion. He was quite tender and had crepitation. AR 215. Dr. McGann thought Plaintiff might have torn his medial meniscus and recommended an MRI. Plaintiff could return to modified work, if available, or otherwise remain on temporary total disability. AR 216.

A physical therapy discharge summary dated October 3, 2003 noted that Plaintiff was working full time on full duty. AR 114.

On October 27, 2003, Plaintiff underwent an MRI of his right knee which showed that his ligament repair was intact and that his meniscal remnant was intact with no evidence of recurrent tear. AR 188.

Plaintiff returned to Dr. McGann in November 2003. Dr. McGann diagnosed a possible rupture of adhesion in joint creating audible pop. He recommended that Plaintiff continue to ride his stationary bike, take Advil and work with restrictions against squatting, crouching, kneeling, stooping, walking on uneven surfaces, or climbing. He needed to wear his brace at work. AR 213-214.

In December 2003, Dr. McGann recommended that Plaintiff continue riding his stationary bike, possibly increasing it to one hour per day. He also changed Plaintiff's anti-inflammatory and indicated that Plaintiff could continue to work in a modified capacity. AR 211. On December 18, 2003, Dr. McGann indicated that Plaintiff could not squat, crouch, kneel, stoop, climb, walk on uneven surfaces, or stand for prolonged periods of time. AR 212.

On January 12, 2004, Plaintiff reported recent increased pain in his right knee to Dr. McGann, with some days better than others. There was no swelling or joint effusion. He had a little joint tenderness medially in the mid portion and a little patellofemoral crepitation as well. Dr. McGann recommended right knee arthroscopy and cicatrix debridement. Plaintiff was released to modified work with restrictions against squatting, crouching, kneeling, stooping, walking on uneven surfaces, climbing, and working at or above shoulder level. AR 207.

1    Plaintiff underwent arthroscopic right knee surgery and debridement on February 12,
2 2004. AR 204- 205. On February 17, 2004, he saw Dr. McGann in follow-up. He was
3 instructed to get his range of motion back with home exercise and a bicycle. AR 203.
4    Plaintiff returned to Dr. McGann on March 2, 2004, and reported that he was doing
5 better. He had slight swelling in his knee and strength was still limited. Range of motion was
6 just about normalized. Dr. McGann released Plaintiff to a modified work capacity, if available,
7 with restrictions against squatting, crouching, kneeling, stooping, walking on uneven surfaces,
8 climbing and working at or above shoulder level. AR 201. Dr. McGann further indicated that it
9 "would probably be fine for him to golf, try to be on even terrain, and not to take full swings."
10 AR 202.
11    On April 16, 2004, Dr. McGann released Plaintiff to light/modified work with regards to
12 his knee. He had to wear his knee brace while at work. AR 198. Examination notes from that
13 day indicate that Plaintiff complained that going downhill is still a little bit of a problem, but that
14 he was golfing and trying to be active. Plaintiff had full range of motion and persistent joint
15 effusion. Dr. McGann recommended that Plaintiff continue with his exercise program and told
16 Plaintiff that he does not need to wear his brace indoors but should reserve it for "vigorous
17 activities such as work or golf if he is walking," along with hunting, soccer, basketball, etc. AR
18 199. As to his shoulder, he was released to light work with permanent restrictions of no
19 pushing/pulling more than 20 pounds with his right upper extremity and no working at or above
20 shoulder level. AR 200.
21    Plaintiff saw Peter J. Mandell, M.D., on May 19, 2004, for a Qualified Medical
22 Examination. Plaintiff had pain in his right sternoclavicular area and constant pain in his right
23 knee. He reported that he limps all the time and can't run, but could play golf about three times a
24 month. On a good day, he could walk for an hour or so before needing to rest, and 30 minutes on
25 a bad day. On examination, there was pain, popping and crepitus at the right sternoclavicular
26 joint with movement. His right knee showed measurable atrophy of the right thigh, 1+ effusion,
27 restrictions in squatting and an inability to kneel, and restrictions in flexion. AR 249-255.
28

1     Dr. Mandell opined that Plaintiff had lost about 40% of his preinjury capacity for using
2  the right upper extremity in pushing, pulling, lifting, carrying and working overhead.  He would
3  need additional treatment, such as analgesic medication and physical therapy.  As to his knee, Dr.
4  Mandell precluded him from heavy lifting, climbing, walking over uneven ground, squatting,
5  kneeling, crouching, crawling, pivoting, and other activities involving comparable physical
6  effort, on a prophylactic basis.  He would need additional treatment, such as analgesic
7  medication, physical therapy, injections and even more surgery.  AR 255-256.
8     On June 2, 2004, Plaintiff returned to Dr. McGann.  Plaintiff was not working.  He wore
9  his knee brace for much of the time and was able to golf a "little bit."  On examination, he had no
10 joint effusion, full range of motion and good stability.  Dr. McGann considered him permanent
11 and stationary.  Subjectively, Plaintiff complained of trouble going down stairs and occasional
12 popping in the knee.  Objectively, he had normal range of motion, no joint effusion and
13 somewhat weak medialis muscle.  Dr. McGann released him to work with the brace on his right
14 knee while at work.  He could do most activities with his right knee and could resume his usual
15 and customary occupation.  He was permanently limited, though, because of his sternoclavicular
16 joint.  AR 196.
17     On June 30, 2004, State Agency physician James V. Glasser, M.D., completed a Physical
18 Residual Functional Capacity Assessment.  He opined that Plaintiff could lift and carry 20
19 pounds occasionally, 10 pounds frequently, could stand and/or walk about six hours and could sit
20 for about six hours.  He was limited in pushing and pulling with his right shoulder.  He could
21 occasionally climb, kneel, crouch and crawl, and could frequently balance and stoop.  Plaintiff
22 was limited in reaching in all directions with his right upper extremity.  This opinion was
23 affirmed on October 22, 2004, by State Agency physician Ernest Wong, M.D.  AR 237-244.
24     In November 2004, Plaintiff saw Alice Martinson, M.D., for a Qualified Medical
25 Examination.  On examination, Plaintiff walked with a normal gait when wearing his brace and a
26 mildly antalgic gait without it.  Tan lines around his brace indicate that he wears it a great deal of
27 the time.  There was no effusion and his knee was stable.  There was some tenderness and
28 crepitus with both active and passive flexion and extension.  There was 2.5 cm of measurable

right thigh atrophy.  Examination of his shoulder revealed visible and palpable instability of the right sternoclavicular joint associated with audible crepitus when his right arm is raised above the horizontal.  He had severe pain and palpable instability of the sternoclavicular joint with any attempt at forceful adduction.  AR 258-269.

Dr. Martinson opined that Plaintiff should be precluded from forceful strength activities with his right arm, heavy lifting, prolonged weight bearing, climbing, squatting, kneeling, crouching, crawling and other activities involving comparable physical effort with his right lower extremity.  AR 269.  Plaintiff asked Dr. Martinson if it was appropriate for him to continue playing golf.  She indicated that since he is right-handed, his knee problems would not be worsened as long as he uses a cart and his brace.  Based on his report that he had altered his swing to avoid significant pain, Dr. Martinson opined that "golf is a reasonable and appropriate recreational activity."  AR 270.

Plaintiff was seen by Kent Yamaguchi, M.D., on January 3, 2005, for complaints of pain in his right wrist.  He was diagnosed with a painful ganglion cyst of the right wrist.  The mass was aspirated.  AR 281.

In August 2005, he was diagnosed with recurrent ganglion cyst of the right wrist.  AR 278.

In November 2005, Plaintiff complained of left-sided sciatica off and on for the past two months.  AR 276.

Plaintiff underwent cervical spine x-rays on December 16, 2005.  The x-rays revealed degenerative disc disease with bilateral bony neural foraminal stenosis involving the C5-6 and C6-7 levels.  AR 275.

ALJ's Findings

After reviewing the medical evidence, the ALJ determined that Plaintiff had the severe impairments of status post-subacromial decompression of the right shoulder, symptomatic instability of the right sternoclavicular joint, status-post-partial medial meniscectomy and ACL repair of the right knee and arthroscopic debridement of the right knee.  AR 16.  He further determined that Plaintiff retained the residual functional capacity ("RFC") to lift up to 20 pounds

occasionally, 10 pounds frequently, sit, stand and walk for a total of six hours each, frequently stoop and balance, and occasionally climb, kneel, crouch or crawl.  He could use his right upper extremity for occasional pushing and pulling, but could not use it for work at or above shoulder height.  AR 17.  Based on the testimony of the VE, the ALJ determined that Plaintiff could perform a substantial number of light, semi-skilled, positions, as well as almost the full range of unskilled sedentary and light work.  AR 20.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Here, the ALJ determined that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset of disability; (2) has an impairment or a combination of impairments that is considered "severe" (status post-subacromial decompression of the right shoulder, symptomatic instability of the right sternoclavicular joint, status-post-partial medial meniscectomy and ACL repair of the right knee and arthroscopic debridement of the right knee) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; but (5) retains the RFC to perform a significant number of light, semi-skilled positions and almost the full range of unskilled sedentary and light work. AR 16-20.

Plaintiff argues that there is no substantial evidence to support the ALJ's finding that he can stand or walk for six hours in an eight hour workday.

**DISCUSSION**

Plaintiff's sole contention is that the ALJ's finding that he could stand or walk for six hours in an eight hour workday is not supported by substantial evidence. In this regard, Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Martinson and incorrectly analyzed his credibility.

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or equivalent work schedule. SSR 96-8p. The RFC assessment must be based on all of

---

[3] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment. SSR 96-8p. In addition, the adjudicator "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe,'" because such limitations may be outcome determinative when considered in conjunction with limitations or restrictions resulting from other impairments. SSR 96-8p.

In making his RFC finding, the ALJ explained that he gave substantial weight to Dr. McGann's opinions, except for his finding that Plaintiff could return to his past work. He also gave substantial weight to the opinions of Drs. Mandell and Martinson, who performed Qualified Medical Examinations. He did not, however, accept Dr. Martinson's finding that Plaintiff needed to avoid prolonged weight bearing because Plaintiff's "physical activities show he can stand or walk for 6 hours, with usual breaks." AR 18. Finally, the ALJ gave substantial weight to the opinion of the State Agency physician. AR 18.

*Dr. Martinson's Opinion*

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating

physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

Dr. Martinson's opinion that Plaintiff was precluded from prolonged weight bearing was contradicted by other opinions, including those of Plaintiff's treating physician and the State Agency Physician. As such, the ALJ needed to set forth specific and legitimate reasons for rejecting it.

In setting forth the medical evidence, the ALJ noted the contradicting opinions as to Plaintiff's ability to stand and walk. For example, in June 2004, Dr. McGann believed that Plaintiff could perform "most activities with the right knee." AR 17, 196. Dr. McGann stated that Plaintiff was limited due to his sternoclavicular joint, but as to his right knee, "he would be capable of resuming his usual and customary occupation." AR 17, 196-197. Although the ALJ rejected this opinion insofar as it suggests that Plaintiff could return to his past work, the ALJ adopted all other aspects of it, including the lack of walking/standing limitations. AR 18. Plaintiff testified that he worked 11-13 days and was on his feet ninety percent of the time. AR 305. Given Dr. McGann's opinion that Plaintiff could return to his past work, the ALJ was certainly reasonable in finding that this supported a lesser ability to stand and/or walk for about six hours with normal breaks.

Plaintiff points to a form dated December 18, 2003, in support of his contention that Dr. McGann did in fact impose a restriction against prolonged standing. Indeed, "no prolonged standing" has a check mark next to it, yet the treatments notes from the same day do not include any such limitation. AR 210-212. This restriction was therefore inconsistent with his treatment notes and his overall opinion of Plaintiff's functional limitation. In any event, the restriction was not in place for long since Plaintiff was released to his usual and customary duties in June 2004. Plaintiff also cites to Dr. McGann's March 2, 2004, treatment note in support of his argument,

but this note only included restrictions against "squatting, crouching, kneeling, stooping, walking on uneven surfaces, climbing or working at or above shoulder level." AR 201-202.

Plaintiff also asserts that the ALJ incorrectly translated Dr. McGann's finding that Plaintiff could perform light work for Workers' Compensation purposes into a finding that he could perform light work in the Social Security context. While Plaintiff is correct that these two systems are distinct and measure disability differently, *DeRosiers v. Sec'y*, 846 F.2d 573 (9th Cir. 1988), the ALJ did not make such a translation. Rather, he set forth Dr. McGann's specific findings and evaluated them within the context of Social Security disability.

In concluding his review of the evidence, the ALJ explained that the State Agency physician who reviewed the record opined that Plaintiff could stand and walk for six hours, with normal breaks. AR 18, 238. This exercise of summarizing the medical evidence and making findings allows the ALJ to meet his burden of providing specific and legitimate reasons for rejecting Dr. Martinson's limitation. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ may properly meet his burden of providing specific and legitimate reasons "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989)).

The ALJ also stated that Plaintiff's physical activities demonstrated that he could stand or walk for six hours, with usual breaks. AR 18. In March 2004, Dr. McGann cleared Plaintiff to play golf and instructed him to try to be on even terrain and not to take full swings. AR 201-202. In November 2004, Plaintiff asked Dr. Martinson if he could continue to play golf. She explained that he could and that doing so would not worsen his knee problems as long as he used a cart and wore his brace. AR 270. According to Plaintiff's testimony, he golfs "a couple of times" a week. AR 317. He testified that he sometimes uses a cart, but has found that walking helps his sciatica. AR 322. Although Plaintiff points to his later testimony that he tries to play small courses like Airways, which is three to three and a half hours, and that though he tries, he usually doesn't play twice a week, the ALJ reasonably relied on Plaintiff's abilities in determining that he could perform light work. The courts do not have the responsibility for

weighing the evidence and resolving conflicts therein, that responsibility belongs to the Commissioner alone. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). In any event, the Court must uphold the ALJ's decision where, as here, the evidence is susceptible to more than one rational interpretation. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

*Plaintiff's Subjective Complaints*

Finally, Plaintiff contends that the ALJ provided insufficient reasons for rejecting his allegations.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

As discussed above, the ALJ reasonably relied on Plaintiff's golfing activities. In addition to his golfing, the ALJ noted that Plaintiff complained of knee soreness after vacation activities in July 2003, which included "a lot of walking and stair climbing." AR 19, 130. The

1 ALJ also noted that Plaintiff wore out his knee brace quickly, which would be unlikely if he were
2 as inactive as he alleged. AR 19, 310. The ALJ may use "ordinary techniques" in addressing
3 credibility, *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make
4 inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir.
5 1996).

6 The ALJ also noted that Plaintiff was prescribed only anti-inflammatory medication for
7 his pain symptoms. Although he testified that he takes Vicodin, there appear to be prescriptions
8 only for anti-inflammatory medications and Plaintiff's list of medication includes only Ibuprofen.
9 AR 102. In any event, the ALJ is entitled to take into consideration the type of medication taken
10 by Plaintiff. SSR 96-7p.

11 Despite Plaintiff's contention to the contrary, the ALJ set forth specific reasons for
12 allowing the Court to conclude that he did not arbitrarily reject Plaintiff's subjective complaints.
13 If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may
14 not engage in second-guessing.

## **RECOMMENDATION**

16 Based on the foregoing, the Court finds that the ALJ's decision is supported by
17 substantial evidence in the record as a whole and is based on proper legal standards.
18 Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision
19 of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for
20 Defendant Jo Anne B. Barnhart and against Plaintiff Billy R. Custer.

21 These findings and recommendations will be submitted to the Honorable Lawrence J.
22 O'Neill, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fifteen (15) days after
23 being served with these findings and recommendations, the parties may file written objections
24 with the court. The document should be captioned "Objections to Magistrate Judge's Findings

and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **October 4, 2007**     /s/ **Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE